Magistrate Judge Trevor Sharp 9-5-11

There is prove and you can read Pages 4, 5 and 6 that proves Eric Placke didn't deny he promised Steven E. Edwards would receive 30 to 39 month imprisonment for agreeing to the Plea Agreement Settlement With this proof alone Steven E. Edwards only approved the Plea Agreement Settlement for one reason, Steven E. Edwards would only receive 30 to 39 months sentencing. If Eric Placke would have ever told Steven E. Edwards hes getting a 150 months sentencing for the Plea Agreement Settlement Steven E. Edwards wouldn't have agreed to the Plea Agreement Settlement. It proves in Eric Placke's affidavid he never told Steven E. Edwards he will get anymore than the 30 to 39 months sentencing Eric Placke's promised Steven E. Edwards. Which Eric Placke never denied his promise of 30-39 months to Steven E. Edwards for agreeing to the Plea Agreement Settlement.

Sincerely

Steven E. Edwards

14975031

on February 21, 2006. During that meeting, Mr. Edwards and I spent several hours conducting final negotiations with the government regarding various forfeiture provisions in the plea agreement, and reviewing the final plea agreement. As part of that final review of the plea agreement, I explained every term in the plea agreement to Mr. Edwards, including the provisions regarding restitution. I also explained that Government counsel had advised me they believed they could establish a health care loss of $1,400,000.00, a workers compensation loss of $4,500,000.00, and a tax loss of between $1,000,000.00 and $2,500,000.00. As part of that final review of the plea agreement I also explained, again, the general nature, specific elements and statutory maximum penalties for each of the charges to which Mr. Edwards would plead guilty.

c. Mr. Edwards also alleges that I was ineffective in that I advised him he "would receive a sentence ranging from thirty (30) to thirty-nine (39) months." According to my notes, the first time I discussed a specific sentencing guideline estimate with Mr. Edwards was at our meeting on January 26, 2006. At that time, based on the loss amounts I had previously discussed with Government counsel, I estimated that, under the 2000 version of the sentencing guidelines, the offense level under the fraud guideline

---

proposed plea agreement from Mr. Edwards, and had spoken with him about it, albeit briefly and apparently not in detail. Mr. Barrow did specifically mention, however, that he had advised Mr. Edwards that his exposure in this case included substantial prison time. The next time I spoke with Mr. Edwards, I advised him regarding my conversation with Mr. Barrow.

would be level 22. I also explained the possibility of a 3-level reduction for acceptance of responsibility. Based on Mr. Edwards' description of his criminal history, I estimated at the time that he would be in criminal history category I. Finally, I explained that the sentencing guidelines were no longer mandatory, but rather advisory.

On February 16, 2006, I met with Government counsel and discussed, among other things, new information regarding higher loss amounts, and the Government's position that the 2001 version of the sentencing guidelines, rather than the 2000 version, would apply if Mr. Edwards pled guilty according to the terms proposed by the Government. A copy of the portion of my notes from that meeting which summarizes the resulting, more severe sentencing guideline scenarios is attached. After that meeting, I further analyzed the issue of which version of the sentencing guidelines would apply, and concluded that, while there was no clear answer, it was at least arguable that the less severe 2000 version would apply, assuming Mr. Edwards pled guilty according to the terms proposed by the government. I also concluded that, if Mr. Edwards were convicted on count twenty-one, there would be no basis for even arguing for application of the earlier, less severe 2000 version of the sentencing guidelines. When I met with Mr. Edwards on February 21, 2006, I discussed with him these revised sentencing guideline scenarios, as well as the factors affecting, and

5. Further affiant saith not.

Eric D. Placke

Sworn to and subscribed before me

this the 21st day of November, 2007.

NOTARY PUBLIC

My Commission Expires: 11/6/2001

RUTH GLASS BURNS
NOTARY PUBLIC
GUILFORD COUNTY, NC
My Commission Expires 11/6/2001

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| STEVEN E. EDWARDS,<br>Petitioner, | : | |
| | : | |
| v. | : | 1:05CR265-1 |
| | : | 1:07CV00501 |
| UNITED STATES OF AMERICA,<br>Respondent. | : | |

DEFENDANT'S REPLY TO MOTION UNDER 28.U.S.C. §2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE

NOW COMES the Defendant-petitioner, Steven E. Edwards, by and through his counsel, John M. Bourlon, and replying to the position stated by the United States of America in its Response to Motion Under 28 U.S.C. §2255 states to the Court the following:

## Facts and Proceedings

In an effort to streamline the arguments presented by the Petitioner in his §2255 Motion, and responded to by the United States of America, this Reply will address the grounds for said Motion in the order in which they were addressed by the United States of America. With respect to the facts and proceedings outlined by the United States of America in its response, the Defendant concurs with the procedural history and will not address the same herein.

## Cognizable Claims

Although the Defendant concurs with the Respondent's analysis of a Motion pursuant to 28 U.S.C. §2255 contained within the Response under the caption "cognizable claim," the Defendant will reply to specific instances raised by the Respondent in the order in which they were addressed.

hereto as Exhibit A). Mr. Edwards did not interpret this question to mean whether he had ever had a head injury or memory loss. Mr. Placke in his affidavit even affirms that "he indicated that the memory loss he experienced after the accident was getting better" (DE #121-2 at 2).

Furthermore, it was not only Mr. Edwards who had explained to Mr. Placke that Petitioner had suffered a head injury resulting in memory loss. During a conversation with Petitioner's counsel in approximately October of 2005, Petitioner's current counsel discussed with Mr. Placke the effects of the aforementioned motorcycle accident, and the change in Mr. Edwards' personality, comprehension, and memory.

Throughout Mr. Placke's representation of Mr. Edwards, Petitioner continued to display symptoms from the accident. Following the sentencing of the Petitioner in late June 2006, Petitioner repeatedly complained of severe headaches, dizziness, and similar symptoms. This all occurred during the period in which Mr. Edwards was facing the important decision of whether or not to appeal the sentence imposed by the District Court. Mr. Placke acknowledges in his affidavit that at this time the Petitioner was suffering from these health concerns, stating that he even contacted the United States Marshals Service regarding these complaints (DE#121-2 at 8). This was in fact done in a July 14th, 2006 letter, a copy of which is attached hereto as Exhibit B. In this letter, Mr. Placke discusses "the fact that Mr. Edwards suffered severe head injuries several years ago in a motorcycle accident" (Exhibit B).

Upon release from the hospital following the motorcycle accident, the Petitioner's actions and routines had drastically changed from prior to the accident. This abnormal behavior is documented in an affidavit by his brother, Richard Edwards, attached hereto

accepted standard and resulted in multiple prejudicial instances. Also as a result of Mr. Placke's conduct, Petitioner did not voluntarily, intelligently and knowingly enter into the plea agreement. Mr. Edwards' competency was central to his defense and Mr. Placke unilaterally abandoned said issue.

The Constitutional protections guaranteed by the Sixth Amendment were repeatedly trounced upon not only by Petitioner's counsel, but also the District Court's decision in imposing a lengthier sentence.

WHEREFORE, the Petitioner, Steven E. Edwards, respectfully submitted that his motion under 28 U.S.C. §2255 should be granted and the judgment of the District Court should be vacated.

This the 6th day of February, 2008.

JOHN M. BOURLON
ATTORNEY FOR PETITIONER

/s/ JOHN M. BOURLON
Attorney for Petitioner
N.C. State Bar No. 9131
Bourlon & Davis, P.A.
109 N. Church Street
Durham, N.C. 27701
Phone: (919) 688-8041
attyjmbourlon@verizon.net

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

STEVEN E. EDWARDS :
:
v. : 1:07CV00501
:
UNITED STATES OF AMERICA :

AFFIDAVIT

NOW COMES Eric D. Placke, first being duly sworn, deposing and saying as follows:

1. I am more than twenty-one years of age and am competent to testify to the matters stated herein, all of which are stated based upon my personal knowledge.

2. I am an Assistant Federal Public Defender for the Middle District of North Carolina.

3. On August 26, 2005, I was appointed by the United States District Court for the Middle District of North Carolina to represent Mr. Steven E. Edwards in case number 1:05CR265-1. On July 27, 2006, I was appointed by the United States Court of Appeals for the Fourth Circuit to represent Mr. Edwards in case number 06-4782.

Wrong Sept. 2005

4. In his 28 U.S.C. § 2255 Motion, Mr. Edwards alleges that I was ineffective in my representation of him. His particular allegations, and my responses thereto, are as follows:

a. Mr. Edwards alleges that I was ineffective in that I "never raised" the "issue of [his] competency." I never raised



that issue because I had no reason to believe Mr. Edwards was suffering from a mental disease or defect that rendered him unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense. Mr. Edwards never indicated that he had ever been treated for, or suffered from, a mental disease or defect, although he was specifically asked about such matters during both my investigator's initial interview of him on August 26, 2005, and during the probation officer's telephonic presentence investigation interview of him on March 8, 2006. He did not mention his prior motorcycle accident to me until our second meeting, on September 21, 2005. At that time, he indicated that the memory loss he experienced after the accident was getting better. At that same meeting, Mr. Edwards and I had a very detailed discussion about the charges against him and his position regarding the facts in the case. We had a series of similarly detailed discussions, involving a variety of legal and factual issues, over the course of the following months. Nothing in those discussions led me to question Mr. Edwards' competence, his ability to understand my legal advice, or his ability to recall the facts of his case. Accordingly, I did not raise the issue of his competence.

He didnt explain nothing on his legal Advice. He never asked me about competence.

b. Mr. Edwards also alleges that I was ineffective in that I "did not fully explain the charges set forth in the Government's indictment to [him], particularly with respect to restitution

significance of, the issue of whether to apply the 2000 or 2001 version of the sentencing guidelines. I also reiterated my earlier advice that the sentencing guidelines were no longer mandatory, but rather advisory.

Ultimately, the court accepted my argument that the less severe, 2000 version of the sentencing guidelines should be applied in Mr. Edwards case. Even with that ruling, the sentence Mr. Edwards received was higher than any specific estimate he and I had discussed. However, that difference was largely the result of three factors: (1) the probation officer's discovery of criminal history beyond that revealed to me by Mr. Edwards, or otherwise known to me prior to disclosure of the presentence report; (2) post-plea actions by Mr. Edwards that resulted in a two-level enhancement for obstruction of justice, and the loss of the three-level reduction for acceptance of responsibility; and (3) the court's decision to impose a variance sentence, above the advisory guideline range.

d. Finally, Mr. Edwards also alleges that I was ineffective in that, although he "repeatedly requested [that I] file an appeal prior to the expiration of the 10 days," I instead filed "an untimely notice of appeal." Mr. Edwards further appears to allege that I should not have said, in the motion to extend the time for filing a notice of appeal, that he initially chose not to appeal, and that my advice regarding a potential petition for writ of

certiorari was inadequate. Mr. Edwards was sentenced on June 13, 2006, but the court did not enter judgment until June 26, 2006. Because I wanted to make sure Mr. Edwards was fully advised regarding his appellate rights, potential appellate issues, and the advisability of an appeal, on June 21, 2006, I sent Mr. Edwards a letter addressing those issues, a copy of which is attached. On June 27, 2006, I met with Mr. Edwards at the Alamance County Jail Annex, gave him a copy of the judgment which had been entered the day before, and explained that the 10-day time in which to file a notice of appeal had begun to run. I also asked Mr. Edwards if he had received my letter of June 21, 2006, and he said he had. I reviewed the entire letter, and the issues I discussed in that letter, with Mr. Edwards. I asked Mr. Edwards if he wanted me to file a notice of appeal, and he said that he did not. At my request, Mr. Edwards then read and signed an appeal rights acknowledgment, a copy of which is attached, directing me not to file a notice of appeal. I complied with that direction.

I did not understand question and couldn't hear

I did not receive any communication from Mr. Edwards indicating he had changed his mind, and wanted me to file a notice of appeal, during the 10-day time for doing so. The first communication of any sort I received from Mr. Edwards after our June 27, 2006, meeting was a letter, postmarked July 10, 2006, and received by my office July 13, 2006. The letter, a copy of which is attached, did not indicate that Mr. Edwards had decided to

15. The total amount of health care funds diverted for Defendant Edwards' personal use is **$1,522,736.90**. This amount takes into account and gives the defendant credit for certain expenses, claims paid, commission paid, and premiums transmitted to insurance companies.

**Sophisticated Means**

16. Defendant Edwards used sophisticated means in marketing his "program." He caused to be created the Fidelity Group to receive health insurance premiums. The victims believed that Fidelity Group was a legitimate HMO or health insurance carrier. Some clients were involved in the construction business and were required to provide proof of workers' compensation insurance before the general contractor would allow them onto job sites. Defendant Edwards caused these employers to receive certificates of coverage which falsely indicated insurance coverage. Defendant Edwards also mailed or caused to be mailed health insurance booklets to victim companies which aided in duping them into believing that insurance coverage existed. The defendant also falsely advised client companies that, if they signed a non-binding option contract, the insurance carrier would consider the client company and Defendant Edwards' companies to have common ownership and cover them for workers' compensation insurance purposes.

17. Defendant Edwards also used sophisticated means in collecting funds from victims. He utilized the Capital Marketing account to receive health insurance premiums. This company was not registered with or known to the North Carolina Secretary of State or the IRS. The bank account for Capital Marketing was opened with a false TIN not issued to or traceable to Defendant Edwards.

18. To prevent detection of the scheme, Defendant Edwards submitted or caused to be submitted false payroll reports to auditors for Liberty Mutual. These false representations were made to prevent Liberty Mutual from learning of the type, number, and location of employees "covered" under the Defendant Edwards' workers' compensation plan.

19. Defendant Edwards is accountable for a total loss in Counts 1 through 18 of **$7,866,222.56.**

**Counts 19 - 21: Tax Evasion**

20. From on or about January 1, 1999, to on or about October 15, 2002, Defendant Edwards concealed his true and correct income by depositing funds into accounts titled in names other than his own, by dispensing funds from accounts titled in names other than his own, by receiving payments and causing payments to be issued in names other than his own, and by titling assets in names other than his own. For example, the cost of building his home in Orange County, NC, was paid for with checks drawn on a Capital Marketing, Inc. (CMI) account. The defendant also purchased various motorcycles in a similar fashion. All of these items constituted income to him as they were for his personal benefit.

21. For tax year 1999, the defendant filed a joint U.S. Individual Income Tax Return, Form 1040, on behalf of himself and his spouse, in which he reported a total income of $200,074, and that the amount of tax due was $55,381. However, the defendant's true income for 1999 was determined by the Internal Revenue Service (IRS) to be $571,675, on which he owed additional taxes of **$154,017.**

22. For tax year 2000, Steven Edwards filed a joint U.S. Individual Income Tax Return, Form 1040, on behalf of himself and his spouse, stating that their joint taxable income for 2000 was $4,833, on which there was due a tax of $724. In truth, however, his actual taxable income for 2000 was at least $4,646,417, on which he owed additional taxes of **$1,944,392.**

23. For tax year 2001, Defendant Edwards failed to file a tax return, thereby not reporting income of at least $24,685, on which he owed taxes of **$7,411**.

24. Defendant Edwards is accountable for a total tax loss of **$2,105,820.**

Victim Impact

25. There are two classes of victims in this case, the employers and the individual employees. According to the government, the employers who paid for non-existent insurance would number between ten and fifty. The government is unable to identify each employee victim because these companies and PEOs hired many part time and seasonal workers. According to the government, more than fifty workers had unpaid workers' compensation or health claims.

26. Bruce Wilson, a former owner of victim PEO company ABP, reported that the sale price of his business was reduced by $680,000 because of unpaid workers' compensation claims. He explained that in addition to his financial loss, his company's reputation was destroyed as a result of the crime. Kathryn Kelley, also a former owner of ABP, stated that the crime was emotionally and financially devastating to her and her business. She further stated, "The outlook for a secure financial future is bleak at best."

27. Fred Sandlin, former owner of Sunshine Companies, reported a loss of $5,182,972 plus interest, which represents a default judgment against Steve Edwards filed in United States District Court for the Southern District of Florida. According to Frank Amodeo, president of Wellington Capital Group, Sunshine paid Fidelity over $7.8 million in premiums to provide health insurance to its employees. When the scheme collapsed, Sunshine's employees were left with millions of dollars in unpaid claims which should have been paid by Fidelity. Sunshine paid over $5.1 million in employees' claims, which eventually led to it going out of business. In addition, Sunshine was subjected to a class action lawsuit that was partially based on the failure of the Fidelity Plan.

Employment Record

78. Defendant Edwards reported that he has been self employed in the insurance business since 1982. He explained that he has worked with Jerry Lancaster, of Plano, Texas, for many years referring clients to Mr. Lancaster's insurance businesses, Providence and Imperial. The defendant advised that he typically earned $20,000 to $30,000 a month. A letter was sent to Mr. Lancaster requesting information regarding the defendant's employment; however, the letter was returned with no information. Further employment experience is unknown.

79. The Social Security Administration Detailed Earnings Statement reflects the following earnings:

| YEAR | AMOUNT | EMPLOYER |
|---|---|---|
| 2000-2005 | None | None |
| 1999 | $107,600 | Magna Leasing Corporation<br>Integrity Corporation |
| 1998 | $136,800 | Magna Leasing Corporation<br>Integrity Corporation |
| 1997 | $68,400 | Magna Leasing Corporation |
| 1996 | $51,950 | Magna Leasing Corporation<br>B-ACCU Florida, Inc. |
| 1995 | 13,807 | Self-Employment |

Financial Condition: Ability to Pay

80. As of the date of this report, Defendant Edwards has failed to provide financial information as required by 18 U.S.C. § 3664. His net worth and monthly cash flow are unknown. The defendant did report that he was earning $20,000 to $30,000 a month in the insurance business prior to his arrest. According to a Motion to Amend Conditions of Release filed on his behalf, the defendant has plans to resume his work with Jerry Lancaster's insurance business. According to the government, the defendant may receive funds, i.e. commission residuals, in the future for work done for Mr. Lancaster.

81. Pursuant to the Plea Agreement, the defendant has consented to the forfeiture of the property named in the forfeiture allegation in the indictment. This property includes $3,897,470 in cash and Lots 15 and 48 of Yonahlossee Saddle Club, located in Brushy Fork Township,

Watauga County, NC. The property in Watauga County was sold for $688,277 in September 2005.

82. Pursuant to the Plea Agreement, the defendant has also consented to the forfeiture of $2,650,829.73 in cash, a 2003 Cruise Master motor home, a 1995 Ford 1-150 truck, a 2002 Continental trailer, and two Harley Davidson motorcycles.

## PART D. SENTENCING OPTIONS

Custody

83. **Statutory Provisions:** For Counts Eight and Fourteen, the maximum term of imprisonment for each count is 5 years. 18 U.S.C. § 1341. For Count Eighteen, the maximum term of imprisonment is 10 years. 18 U.S.C. § 669. For Count Twenty, the maximum term of imprisonment is 5 years. 26 U.S.C. § 7201.

84. **Guideline Provisions:** Based on a total offense level of 35 and a criminal history category of III, the guideline range for imprisonment is 210 to 262 months. USSG Ch.5 Pt.A - SENTENCING TABLE.

Impact of Plea Agreement

85. The Plea Agreement has no impact on the calculation of the guidelines.

Supervised Release

86. **Statutory Provisions:** If a term of imprisonment is imposed for each of Counts Eight, Fourteen, Eighteen, and Twenty, the Court may impose a term of supervised release of not more than 3 years. 18 U.S.C. § 3583(b)(2). Such terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

87. **Guideline Provisions:** For each of Counts Eight, Fourteen, Eighteen, and Twenty, the term of supervised release is at least 2 years but not more than 3 years. USSG §5D1.2(a)(2). Supervised release is required if the Court imposes a term of imprisonment of more than 1 year. USSG §5D1.1(a). The Court may order a term of supervised release to follow imprisonment in any other case. USSG §5D1.1(b).

Probation

88. **Statutory Provisions:** In each of Counts Eight, Fourteen, Eighteen, and Twenty, the defendant is eligible for not less than 1 year nor more than 5 years probation. 18 U.S.C. § 3561(c)(1).

89. **Guideline Provisions:** Because the minimum of the guideline range is 8 months or higher (Zone C or D of the Sentencing Table), the defendant is ineligible for probation. USSG §5B1.1, comment.(n.2).

Fines

90. **Statutory Provisions:** The maximum fine for each of Counts Eight, Fourteen, Eighteen, and Twenty is $250,000. 18 U.S.C. § 3571(b)(3). The Court shall impose a special assessment of $100 for each felony count of conviction. 18 U.S.C. § 3013(a)(2)(A).

91. **Guideline Provisions:** The fine range for the instant offense is from $20,000 to $200,000. USSG §5E1.2(c)(3).

92. In determining the amount of the fine, the Court shall consider the expected costs to the government of any term of probation, or term of imprisonment and the term of supervised release imposed. USSG §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts, dated April 15, 2005, suggests that a monthly cost of $1,933.80 be used for imprisonment, $1,675.23 monthly for a halfway house, and a monthly cost of $287.73 for supervision.

Restitution

Never agreed in Plea agreement or ... to all

93. **Statutory Provisions:** The Court shall enter a restitution order for the full amount of the loss to the victim(s). 18 U.S.C. § 3663A. The Court may order restitution in any criminal case to the extent agreed to by the parties in a Plea Agreement. 18 U.S.C. § 3663(a)(3). The total amount of restitution attributable to the defendant is **$4,565,477.70**. Payments should be made payable and submitted to the Clerk of Court, United States District Court/Middle District of North Carolina, P. O. Box 2708, Greensboro, NC 27402. Payments should be disbursed to:

Sikora & Associates
Attn: Jim Sikora
25 Concourse Way
Greer, SC 29650

**Amount:** $98,834.81

586,887.53
685,722.34
935,214.54
1,620,936.88
838,720.82
2,459,657.70
-2,105,820.00
-2,565,477.70

BCN Services
Attn: Gary Houle
3650 W. Liberty Ave.
Ann Arbor, MI 48103

**Amount:** $586,887.53

McKenzie Paint
Attn: Todd McKenzie
P.O. Box 790
Rockwell, NC 28138

**Amount:** Undetermined

Sunshine Group
Attn: Fred Sandlin
1635 S. Ridge Wood Ave.
Suite 206
Daytona, FL 32119

**Amount:** $935,214.54

ABP
Attn: Bruce Wilson
815 Mill Stream Lane
Ormand Beach, FL 32174

**Amount:** $838,720.82

Internal Revenue Service
Post Office Box 47- 421
MPU- Stop 151
Doraville, GA 30362

**Amount:** $2,105,820.00

94. **Guideline Provisions:** The Court shall enter a restitution order for the full amount of the loss to the victim(s). USSG §5E1.1(a)(1).

COUNT EIGHT

1. The Grand Jury realleges and incorporates by reference Paragraphs One through Thirty of Count One of this Indictment as if fully set forth herein.

2. On or about November 14, 2000, in the County of Durham, in the Middle District of North Carolina, STEVEN E. EDWARDS, for the purpose of executing the aforesaid scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, knowingly did cause to be received from FedEx, a commercial interstate carrier, an overnight package addressed to:

Magna Corporation
5317 Highgate Road
Suite 114
Durham, NC 27713

and with a return address of:

BCN Services, Inc
3650 W Liberty Road
Ann Arbor, MI 48103

which contained therein 20 corporate checks from BCN Services, and related companies, payable to Magna Corporation, in an amount totaling $ 103,000, more or less, which funds were transmitted to pay for workers' compensation for hundreds of employees working outside the State of North Carolina, when, in fact, there was no workers' compensation insurance policy in effect protecting those workers. All in violation of Title 18, United States Code, Sections 1341 and 2.

COUNT FOURTEEN

1. The Grand Jury realleges and incorporates by reference Paragraphs One through Thirty of Count One of this Indictment as if fully set forth herein.

2 On or about February 28, 2001, in the County of Durham, in the Middle District of North Carolina, STEVEN E. EDWARDS, for the purpose of executing the aforesaid scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, knowingly did cause to be received from FedEx, a commercial interstate carrier, an overnight package addressed to:

> Tim Martin
> Magna/Fidelity
> 5317 Highgate Drive Ste 114
> Durham, NC 27713

and with a return address of.

> Sikora and Associates, Inc
> 25 Concourse Way,
> Greer, SC 29650-4704

which contained therein an R.J. Rossi check, № 1376, payable to Magna Corp, in the amount of $ 47,829.73, which funds were sent to pay the February, 2001, premium due for medical insurance for workers in South Carolina employed by Sikora & Associates, when, in fact, there was no health care insurance policy in effect for those employees. All in violation of Title 18, United States Code, Sections 1341 and 2.

COUNT EIGHTEEN

1. The Grand Jury realleges and incorporates by reference Paragraphs One through Thirty of Count One of this Indictment as if fully set forth herein.

2 During the period from on or about January 1, 2000, until on or about April 30, 2001, the exact dates to the Grand Jurors unknown, in the Middle District of North Carolina and elsewhere, STEVEN E. EDWARDS, did on one or more occasions knowingly and willfully steal and without authority convert to his own use moneys and funds in excess of $ 100, the total amount of moneys and funds stolen and without authority converted to his own use during the said time period being the approximate sum of $ 2,500,000 from a health care benefit program, which affected commerce, as defined by Title 18, United States Code, § 24(b), that is, The Fidelity Group, Inc., also known as Premier Health Plan and Members Choice 2000 Health Plan; in violation of Title 18, United States Code, Sections 669 and 2.

| Form **4549-A** (Rev. March 2008) | Department of the Treasury-Internal Revenue Service **Income Tax Discrepancy Adjustments** | Page 1 of 2 |
|---|---|---|

| Name and Address of Taxpayer | Taxpayer Identification Number | Return Form No.: |
|---|---|---|
| Steven E. & Marian C. Edwards<br>Steven E. Edwards Reg #14975-031<br>USMCFP PO Box 4000<br>Springfield MO 65801 | 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 | 1040 |
| | Person with whom examination changes were discussed. | Name and Title: |

| **1. Adjustments to Income** | **Period End** 12/31/2000 | **Period End** | **Period End** |
|---|---|---|---|
| a. Interest Income | 63,648.00 | | |
| b. Other Income-Diverted Funds | 2,641,215.00 | | |
| c. Itemized Deductions | 20,339.00 | | |
| d. Standard Deduction | (7,350.00) | | |
| e. Exemptions | 8,400.00 | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. | | | |
| j. | | | |
| k. | | | |
| l. | | | |
| m. | | | |
| n. | | | |
| o. | | | |
| p. | | | |
| 2. **Total Adjustments** | 2,726,252.00 | | |
| 3. Taxable Income Per Return or as Previously Adjusted | 7,633.00 | | |
| 4. **Corrected Taxable Income** | 2,733,885.00 | | |
| Tax Method | TAX RATE | | |
| Filing Status | Joint | | |
| 5. **Tax** | 1,055,286.00 | | |
| 6. **Additional Taxes / Alternative Minimum** | | | |
| 7. Corrected Tax Liability | 1,055,286.00 | | |
| 8. **Less Credits** a. | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| 9. **Balance** *(Line 7 less total of Lines 8a thru 8d)* | 1,055,286.00 | | |
| 10. Plus Other Taxes a. | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| 11. Total Corrected Tax Liability *(Line 9 plus Lines 10a thru 10d)* | 1,055,286.00 | | |
| 12. Total Tax Shown on Return or as Previously Adjusted | 1,144.00 | | |
| 13. Adjustments to: a. | | | |
| b. | | | |
| c. | | | |
| 14. Deficiency-Increase in Tax or *(Overassessment - Decrease in Tax)* *(Line 11 less Line 12 adjusted by Lines 13a thru 13d)* | 1,054,142.00 | | |
| 15. Adjustments to Prepayment Credits-Increase *(Decrease)* | | | |
| 16. **Balance Due or (Overpayment)** - *(Line 14 adjusted by Line 15)* *(Excluding interest and penalties)* | 1,054,142.00 | | |

**Taxpayer Name:** Edwards, Steven E. & Marian C.
**Examiner:** Hammock, Mary Ann
**TIN:** 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
**Tax Form:** 1040
**Date:** 3/18/2009

## Income Lead Sheet

Further, in order to divert the funds collected for insurance premiums to his personal use, Edwards established financial accounts in the names of nominees, including his wife, Capital Marketing, Inc, and Carolina Green, Inc. He used the funds to acquire assets—including an expensive home built in 2000, a "mountain chalet", investments, vehicles and motorcycles—also titled in nominee names in several instances.

Steven E. and Marian C. Edwards reported less than $40,000 in income on their joint 2000 1040. None of the diverted funds were reported.

The United States included a "Factual Basis" for the charges as part of the plea agreement. The document specifically identified amounts diverted by Steven Edwards in 2000, which are includible in income. These amounts are shown in the table on the following page.

This $2,641,215 in funds diverted for the personal use of Steven Edwards is includible in income in the tax year 2000.

**Law:** *(Tax Law, Regulations, court cases, and other authorities. If Unagreed, include Argument)*

**IRC Section: 61**

For federal income tax purposes, gross income means all income from whatever source derived, except for those items specifically excluded by other sections of the Internal Revenue Code. Gains from illegal transactions, including embezzlement or fraud, are includible in income.

Specific citations:

Eugene C. James v. United States, 61-1 USTC ¶9449

**Taxpayer Position:** *(If applicable)*

5

| | | | |
|---|---|---|---|
| **Taxpayer Name:** | Edwards, Steven E. & Marian C. | **Examiner:** | Hammock, Mary Ann |
| **TIN:** | 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 | | |
| **Tax Form:** | 1040 | **Date:** | 3/18/2009 |

## Income Lead Sheet

| Date | Account/Check # | Payee | Amount |
|---|---|---|---|
| 1/17/00 | Capital Marketing #2611 | CynMar (Builder) | $197,702 |
| 2/21/00 | Capital Marketing #2472 | CynMar | $124,814 |
| 3/5/00 | Capital Marketing #2617 | CynMar | $137,000 |
| 3/20/00 | Capital Marketing #2616 | CynMar | $103,996 |
| 5/10/00 | Capital Marketing #2620 | CynMar | $238,224 |
| 5/26/00 | Capital Marketing #2621 | CynMar | $189,388 |
| 6/15/00 | Capital Marketing #2624 | CynMar | $181,033 |
| 7/19/00 | Capital Marketing #2450 | CynMar | $31,414 |
| 9/29/00 | Capital Marketing #2643 | CynMar | $88,315 |
| 3/4/00 | Capital Marketing #2473 | Myrtle Beach Harley | $42,995 |
| 12/1/00 | Capital Marketing #2677 | Rocky Mount Harley | $26,090 |
| 3/14/00 | Capital Marketing #2475 | Twin Specialties (motorcycle) | $50,000 |
| 6/26/00 | Capital Marketing #2625 | Twin Specialties (motorcycle) | $20,000 |
| 8/3/00 | Capital Marketing #2628 | Twin Specialties (motorcycle) | $20,159 |
| 8/23/00 | Capital Marketing #2632 | Twin Specialties (motorcycle) | $23,692 |
| 10/25/00 | Capital Marketing #2644 | Twin Specialties (motorcycle) | $25,000 |
| 1/4/00 | Sunshine Company #048794 | Steven Edwards (diversion) | $13,245 |
| 2/1/00 | Sunshine Company #049998 | Steven Edwards (diversion) | $14,179 |
| 4/25/00 | Sunshine Company #052591 | Steven Edwards (diversion) | $19,835 |
| 7/6/00 | Sunshine Company #055355 | Steven Edwards (diversion) | $17,020 |
| 7/25/00 | Sunshine Company #056086 | Steven Edwards (diversion) | $23,028 |
| 8/22/00 | Sunshine Company #056949 | Steven Edwards (diversion) | $22,146 |
| 6/12/00 | Fidelity Group #2024 | Steven Edwards (diversion) | $154,379 |
| 7/14/00 | Fidelity Group #2049 | Steven Edwards (diversion) | $62,561 |
| 3/7/00 | Capital Marketing wire transfer | Bear Stearns (investment) | $115,000 |
| 3/17/00 | Capital Marketing wire transfer | Bear Stearns | $102,000 |
| 3/27/00 | Capital Marketing wire transfer | Bear Stearns | $130,000 |
| 4/12/00 | Capital Marketing wire transfer | Bear Stearns | $119,000 |
| 4/26/00 | Capital Marketing wire transfer | Bear Stearns | $80,000 |
| 5/1/00 | Capital Marketing wire transfer | Bear Stearns | $75,000 |
| 5/22/00 | Capital Marketing wire transfer | Bear Stearns | $145,000 |
| 7/13/00 | Capital Marketing wire transfer | Bear Stearns | $49,000 |
| | | **Total** | **$2,641,215** |

**Income Lead Sheet**
**Rev. 1/2004**

**Workpaper #: 502 -1.3**